[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 22, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-11150

_____

D. C. Docket No. 01-10119-CV-JLK

DENNIS REEVES COOPER,

Plaintiff-Appellant,

versus

GORDON A. DILLON,
individually and in his official
capacity as Chief of Police of Key West,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 22, 2005)

Before BIRCH, KRAVITCH and GIBSON*, Circuit Judges.

_____

* Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting
by designation.

BIRCH, Circuit Judge:

This appeal requires us to determine the constitutionality under the First Amendment of a Florida statutory provision which makes it a misdemeanor for a participant in an internal investigation of a law enforcement officer to disclose any information obtained pursuant to the investigation before it becomes public record.[1] The district court found that the statute did not abridge fundamental freedoms of speech and of the press guaranteed by the United States Constitution. Because the statute is a content-based restriction which chills speech that "lies near the core of the First Amendment," Landmark Communications, Inc. v. Virginia,

---

[1] The statute in question, FLA. STAT. ch. 112.533(4), reads as follows:
Any person who is a participant in an internal investigation, including the complainant, the subject of the investigation and the subject's legal counsel or a representative of his or her choice, the investigator conducting the investigation, and any witnesses in the investigation, who willfully discloses any information obtained pursuant to the agency's investigation, including, but not limited to, the identity of the officer under investigation, the nature of the questions asked, information revealed, or documents furnished in connection with a confidential internal investigation of an agency, before such complaint, document, action, or proceeding becomes a public record as provided in this section commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083. However, this subsection does not limit a law enforcement or correctional officer's ability to gain access to information under paragraph (2)(a). Additionally, a sheriff, police chief, or other head of a law enforcement agency, or his or her designee, is not precluded by this section from acknowledging the existence of a complaint and the fact that an investigation is underway.
FLA. STAT. ch. 112.533(4). The proscription of disclosure in this statute applies as long as an investigation is "active." See id. at ch. 112.533(2). "[A]n investigation shall be considered active as long as it is continuing with a reasonable, good faith anticipation that an administrative finding will be made in the foreseeable future." Id. However, an investigation is "presumed to be inactive if no finding is made within 45 days after the complaint is filed." Id.

435 U.S. 829, 838, 98 S. Ct. 1535, 1541 (1978), we **REVERSE** and **REMAND** to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiff-appellant Dennis Reeves Cooper is the publisher and editor of Key West The Newspaper ("the newspaper"), a free weekly newspaper that is distributed to several hundred locations in Key West, Florida. In a series of articles published by the newspaper in May and June of 2001, Cooper reported that Robert Christensen, an internal affairs investigator with the Key West Police Department ("KWPD"), failed to investigate a complaint filed with the Florida Department of Law Enforcement ("FDLE").[2] Based on information he collected while writing these articles, Cooper, in his capacities as a citizen and as the publisher of a newspaper,[3] filed a formal complaint against Christensen with the FDLE for

---

[2] The complaint detailed in Cooper's articles was filed by Shahdaroba Rodd, a Key West citizen who alleged that KWPD officer Al Flowers committed perjury by lying in court during the prosecution of Rodd for a traffic offense. Although Christensen represented to the FDLE that Rodd's complaint was unfounded, Cooper reported that Christensen had not in fact conducted any investigation of Rodd's complaint.

[3] Dillon argues that Cooper acted as a private citizen and that any information the FDLE shared with Cooper was in his capacity as a complainant and not a newspaper publisher. While case law does recognize that members of the press have an important place in a free society, they are afforded no greater First Amendment rights than ordinary citizens, who are free to publish information as well. See Branzburg v. Hayes, 408 U.S. 665, 704, 92 S. Ct. 2646, 2268 (1972) ("Freedom of the press is a fundamental personal right which is not confined to newspapers and periodicals.") (internal citation omitted); see also Bartnicki v. Vopper, 532 U.S. 514, 525 n.8, 121 S. Ct. 1753, 1760 n.8 (2001) (drawing "no distinction" for First Amendment purposes between members of the media and a private citizen). Accordingly, we decline to afford any legal significance to Dillon's characterization of the capacity in which Cooper acted in this case.

3

Christensen's alleged failure to investigate and falsification of information in his report.

Cooper subsequently received two letters from the FDLE. The first letter, which was addressed to Cooper, indicated that the FDLE had received his complaint and had instructed Defendant-appellee Gordon A. Dillon to investigate the matter. The second letter was a courtesy copy of a letter sent by the FDLE to Dillon requesting that he investigate Cooper's complaint and report back to the FDLE within forty-five days. Following his receipt of these letters, Cooper published a 15 June 2001 article reporting that he had lodged a complaint against Christensen and that the FDLE had instructed Dillon to investigate the matter within forty-five days. In a 22 June 2001 "Commentary," Cooper recounted the allegations set forth in the previous week's article and implored Dillon to "tell the truth [about the result of his investigation] and let the chips fall where they may." R2-55 at 3.

On 22 June 2001, the same day that Cooper's "Commentary" was published, Dillon swore an affidavit and obtained a warrant for Cooper's arrest. The affidavit alleged that Cooper violated FLA. STAT. ch. 112.533(3)[4] by disclosing in his

---

[4] Because the version of FLA. STAT. ch. 112.533(3) that was in place when Dillon obtained the warrant gave a law enforcement officer the right to inspect his or her own personnel file at any time, the district court found that the citation to § 112.533(3) in Dillon's affidavit was a "scrivener's error" and that Dillon meant to charge Cooper with a violation of § 112.533(4).

articles two items of information he obtained as a participant in an internal investigation—that Christensen was the subject of an official investigation and that Dillon had forty-five days to respond to the FDLE. Following his arrest, Cooper was held in the county jail for approximately three hours and then released on his own recognizance. The State Attorney subsequently declined to pursue the charges against Cooper because the statute under which Cooper was charged, FLA. STAT. ch. 112.533(3), had been declared unconstitutional.

On 21 December 2001, Cooper filed suit for declaratory and injunctive relief and damages pursuant to 42 U.S.C. § 1983 for Dillon's enforcement of FLA. STAT. ch. 112.533(4) allegedly in violation of his First, Fourth, and Fourteenth Amendment rights. Cooper sued Dillon both as an individual and in his official capacity as Chief of Police of Key West. Dillon, in his individual capacity, subsequently moved for summary judgment on the grounds that he was entitled to qualified immunity. He also asserted he was entitled to summary judgment in his official capacity because Cooper had failed to show that Dillon's enforcement of the statute constituted a deprivation of constitutional rights. Cooper then moved

R2-70 at 3 n.11. Prior to 1990, FLA. STAT. ch. 112.533(3) outlawed in broader terms the conduct outlawed by the current version of FLA. STAT. ch. 112.533(4). This pre-1990 version of § 112.533(3) was found unconstitutional in Hickox v. Tyre, No. 87-8324, slip op. at 1 (S.D. Fla. Oct. 15, 1990). On appeal, Cooper argues as he did before the district court that Dillon was in fact attempting to charge him with violating the pre-1990 version of § 112.533(3) even though it had been found unconstitutional.

for partial summary judgment on the ground that FLA. STAT. ch. 112.533(4) was unconstitutional. The magistrate judge's recommendation and report recommended that Cooper's motion for partial summary judgment be granted because FLA. STAT. ch. 112.533(4) was an unconstitutional content-based restriction on speech. The district court rejected the magistrate judge's report, found that the statute was content-neutral and not unconstitutional, and consequently granted Dillon's motions for summary judgment. On appeal, Cooper argues that the statute is unconstitutional and that Dillon's enforcement of it subjected Dillon in his individual and official capacities to liability under 42 U.S.C. § 1983.

## II. DISCUSSION

A. Constitutionality of FLA. STAT. ch. 112.533(4)

"The constitutionality of a statute is a question of law subject to de novo review." Doe v. O'Brien, 329 F.3d 1286,1293 (11th Cir.), cert. denied, 540 U.S. 947, 124 S. Ct. 389 (2003).

The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I. These sacrosanct freedoms

are widely recognized as necessary to foster the uninhibited self-expression which is characteristic of our free society.  See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 165-66, 122 S. Ct. 2080, 2089 (2002); Procunier v. Martinez, 416 U.S. 396, 427, 94 S. Ct. 1800, 1818 (1974) (Marshall, J., concurring), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 109 S. Ct. 1874 (1989).  But more importantly, these First Amendment freedoms are also understood to be essential to the maintenance of our democratic polity, which depends upon an informed citizenry to hold government officials accountable for error and abuse and to seek redress and change by lawful means. See Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S. Ct. 209, 216 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."); Stromberg v. California, 283 U.S. 359, 369, 51 S. Ct. 532, 536 (1931).  Indeed, it was a desire for government accountability in the face of perceived abuses that ignited the movement toward the foundation of our country, see THE DECLARATION OF INDEPENDENCE para. 30 (U.S. 1776); and this same desire subsequently inspired the Framers to guarantee the rights to speak, to publish, and to petition government, see Whitney v. California, 274 U.S. 357, 375, 47 S. Ct. 641, 648 (1927) (Brandeis, J., concurring) (noting that the Framers believed that "the path of safety lies in the opportunity to discuss freely supposed

7

grievances"), overruled on other grounds, Brandeburg v. Ohio, 395 U.S. 444, 89 S. Ct. 1827 (1969). Based on this understanding, it has been universally recognized that one of the primary purposes of the First Amendment is to "protect the free discussion of governmental affairs" because the maintenance of a responsible democratic government depends upon it. Landmark Communications, Inc., 435 U.S. at 838, 98 S. Ct. at 1541 (citation omitted); Wood v. Georgia, 370 U.S. 375, 392, 82 S. Ct. 1364, 1374 (1962) (noting that the "purpose of the First Amendment includes the need: . . . to protect parties in the free publication of matters of public concern, [including] . . . any just criticism upon [government officials'] conduct in the exercise of the authority which the people have conferred upon them") (citation omitted).

Crucial to the democratic task of holding government officials accountable and informing the citizenry is a free press. See Cox Broad. Corp. v. Cohn, 420 U.S. 469, 491-92, 95 S. Ct. 1029, 1044 (1975); Sheppard v. Maxwell, 384 U.S. 333, 350, 86 S. Ct. 1507, 1515 (1966) ("The press . . . guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism."). By investigating government abuse and providing a forum for citizens to amplify their complaints against government and inform their fellow citizens, a vigilant, responsible, and, most importantly, free

press guarantees that "debate on public issues [can] be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 721 (1964). Recognizing the importance of the press in our democratic society, the United States Supreme Court has found that if the press "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." Smith v. Daily Mail Publ'g Co., 443 U.S. 97, 103, 99 S. Ct. 2667, 2671 (1979).

The Court in Smith thus recognized that, despite the centrality of the First Amendment protections to our democratic society, the freedoms of speech and of the press can be subjected to certain limitations. Id. The extent to which these limitations are constitutionally permissible depends upon the kind of restriction imposed. Because statutes silencing speech before it happens are inimical to the tenets of free expression underlying a free society, these statutes are characterized as prior restraints on speech and are subjected to strict scrutiny. See Burk v. Augusta-Richmond County, 365 F.3d 1247, 1251 (11th Cir. 2004). Because statutes representing governmental favoritism of preferred speech or suppression of disfavored speech are likewise antithetical to a free society, these content-based restrictions are also subjected to strict scrutiny. See Boos v. Barry, 485 U.S. 312,

9

321, 108 S. Ct. 1157, 1164 (1988).  Statutes which prescribe the time, place, and manner in which First Amendment rights may be exercised irrespective of the message being conveyed are deemed to be content-neutral statutes which are analyzed under a lower standard of scrutiny.  See City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 47, 106 S. Ct. 925, 928 (1986).

Thus, the crucial threshold issue in this case is the level of scrutiny that must be applied to FLA. STAT. ch. 112.553(4) based on the characterization of the restriction imposed.  Cooper argues that the statute is a prior restraint and/or a content-based restriction.  Dillon argues that the district court properly classified the statute as content-neutral.

1.  Characterization of FLA. STAT. ch. 112.553(4)

A prior restraint on speech prohibits or censors speech before it can take place.  See Alexander v. United States, 509 U.S. 544, 553, 113 S. Ct. 2766, 2773 (1993).  Classic prior restraints have involved judge-issued injunctions against the publication of certain information.  See, e.g., Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 556-58, 96 S. Ct. 2791, 2801-03 (1976).  Prior restraints have also been found where the government has unbridled discretion to limit access to a particular public forum.  See United States v. Frandsen, 212 F.3d 1231, 1236-37 (11th Cir. 2000) (finding prior restraint where a National Park Service licensing scheme gave

park official unlimited power to grant or deny permits to protest in the park). A prior restraint, however, does not exist where a publisher is faced with criminal sanctions for publishing certain information. See Alexander, 509 U.S. at 553-54, 113 S. Ct. at 2773 (distinguishing between prior restraint and threat of post-publication punishment).

In determining whether a regulation is content-based or content-neutral, courts must "look to the purpose behind the regulation." Bartnicki v. Vopper, 532 U.S. 514, 526, 121 S. Ct. 1753, 1760 (2001). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 643, 114 S. Ct. 2445, 2459 (1994). Content-based restrictions are found where the statute's prohibition is "directed only at works with a specified content." Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd., 502 U.S. 105, 116, 112 S. Ct. 501, 508 (1991). By contrast, content-neutral statutes are those which can be "justified without reference to the content of the regulated speech." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754 (1989) (internal citations omitted). "[A] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791, 109 S. Ct. at 2754.

11

Based on the foregoing, contrary to Cooper's contentions, FLA. STAT. ch. 112.533(4) cannot be characterized as a prior restraint on speech because the threat of criminal sanctions imposed after publication is precisely the kind of restriction that the Court has deemed insufficient to constitute a prior restraint. See CBS Inc. v. Davis, 510 U.S. 1315, 1317, 114 S. Ct. 912, 914 (1994) (distinguishing between "a threat of criminal or civil sanctions after publication" which "chills speech" and a prior restraint which "freezes" speech) (citation omitted). That Florida's statutory scheme was not a prior restraint is underscored by the fact that Cooper was able to publish the information he obtained pursuant to the FDLE investigation without first having to obtain a government-issued license or challenge a government-imposed injunction. Because the statute did not silence Cooper before he could speak, it cannot be classified as a prior restraint.

Rather, the statute is content-based because the purpose of the statute is to stifle speech of a particular content, namely, speech regarding pending investigations of law enforcement officers. See Simon & Schuster, Inc., 502 U.S. at 116, 112 S. Ct. at 508. While the district court focused on the fact that the statute only proscribed the dissemination of information on the basis of *how* it was obtained (i.e. pursuant to an investigation), it failed to analyze the statute's "purpose" to determine whether it was content-based vel non. See Bartnicki, 532

12

U.S. at 526, 121 S. Ct. at 1760. In articulating the purposes behind the statute, Dillon argues that the statute has the content-neutral purposes of (1) preventing the subversion of internal investigations which could result from witnesses manufacturing false testimony against officers to comport with other complainants; and (2) protecting against the defamation of wrongfully accused officers. Yet, based on Dillon's articulation of each of these rationales, it is clear that the subversion of an investigation or the defamation of an officer would only take place if information *critical* of law enforcement officers learned pursuant to an investigation was disclosed. Accordingly, the statute cannot be "justified without reference to the content of the regulated speech" and therefore operates to suppress ideas of a particular content. Ward, 491 U.S. at 791, 109 S. Ct. at 2754; see also Kamasinski v. Judicial Review Council, 44 F.3d 106, 109 (2d Cir. 1994) (finding a statute which prohibited a complainant from disclosing information learned as a participant of an investigation of a judge to be content-based); Baugh v. Judicial Inquiry & Review Comm'n, 907 F.2d 440, 444 (4th Cir. 1990) (same).

2. Application of Strict Scrutiny

Based on our characterization of FLA. STAT. ch. 112.533(4) as a content-based restriction, it must be subjected to strict scrutiny. See United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813, 120 S. Ct. 1878, 1886 (2000). "If

13

a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest." Id. Dillon argues that the statute is supported by three compelling state interests: (1) the interest in maintaining the integrity of the investigative process by shielding potential witnesses from information which could alter their testimony; (2) the interest in protecting the reputations of wrongfully accused officers; and (3) the privacy interests of complainants, witnesses, and persons conducting the investigations. In addition, Dillon argues that the statute is narrowly tailored to serve these interests because: (1) it limits only the speech of participants in an investigation; (2) it applies only to speech obtained pursuant to the investigation; and (3) it prohibits speech only for a limited time until the investigation becomes public record.

Based on our review of Supreme Court precedent, the state interests proposed by Dillon are not sufficiently compelling to justify the statute's abridgment of First Amendment freedoms.[5] We examine each of the state interests

---

[5] Because FLA. STAT. ch. 112.533(4) is constitutionally deficient for lack of compelling state interests, we need not decide whether the statute is narrowly tailored to serve those interests. We note that while the statute is appropriately limited to participants, see Landmark Communications, Inc., 435 U.S. at 837 & n.10, 98 S. Ct. at 1540-41 & n.10, applicable only to information gleaned pursuant to the investigation, see Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34, 104 S. Ct. 2199, 2208 (1984), and lasts for a presumptively definite duration, see Butterworth v. Smith, 494 U.S. 624, 632, 110 S. Ct. 1376, 1381 (1990), there is some question as to whether the statute is narrowly tailored because it may permit an indefinite ban on disclosure. Although Florida law does provide that an investigation is "presumed" to be completed within forty-five days, this presumption can be obviated if the investigating officials assert in "good faith" that the investigation is still active and will conclude in the "foreseeable future." FLA.

14

proposed by Dillon in turn.

First, the Court has rejected the proposition that the maintenance of the integrity of an investigative process constitutes a sufficiently compelling justification for a content-based restriction on speech such as imposed by FLA. STAT. ch. 112.533(4). See Landmark Communications, Inc., 435 U.S. at 841, 98 S. Ct. at 1542 (assuming that confidentiality of proceedings might be a "legitimate" interest, but finding that it did not constitute a compelling interest). In fact, the Court in Landmark found that there was no evidence that prohibitions on disclosure of information actually preserved the integrity of the investigative process or the witnesses. Id. Dillon's description of the harm that may have resulted from Cooper's disclosures—that Christensen was the subject of the investigation and that Dillon had forty-five days to investigate—represents the same kind of unsubstantiated assertions. While the Court has recognized that secrecy and confidentiality may be constitutionally permissible in the context of grand jury proceedings, see Butterworth, 494 U.S. at 629-30, 110 S. Ct. at 1380 (noting the importance of secrecy in grand jury proceedings while the grand jury is

---

STAT. ch. 112.533(2)(b). This clause could allow law enforcement officials to place a permanent restriction on disclosing information learned pursuant to an investigation. See First Amendment Coalition v. Judicial Inquiry & Review Bd., 784 F.2d 467, 478 (3rd Cir. 1986) (finding potential for permanent ban on speech where a participant in a judicial misconduct proceeding could not divulge certain information until the government chose to make the charges public). Because FLA. STAT. ch. 112.533(4) is not supported by a compelling state interest, however, we need not decide whether this dynamic renders the statute constitutionally infirm.

15

impaneled), or in a trial setting, see Seattle Times Co., 467 U.S. at 37, 104 S. Ct. at 2209-2210 (finding that a protective order prohibiting a newspaper from publishing information it obtained through discovery procedures was not unconstitutional), the context of an FDLE internal investigation can be distinguished from such litigation-related activities which historically have been afforded greater protections for their confidentialty. See Landmark Communications, Inc., 435 U.S. at 841, 98 S. Ct. at 1542 (finding that secrecy of a non-grand jury investigation into judicial misconduct was insufficiently compelling rationale for restriction on speech); see also Butterworth, 494 U.S. at 629-30, 104 S. Ct. at 1380 (suggesting that the function historically served by grand jury proceedings distinguishes them from other proceedings); Rhinehart, 467 U.S. at 34, 104 S. Ct. at 2208 (noting the difference between disclosing information obtained through discovery and disclosing information learned in a non-trial context). Finally, Dillon's argument that important interests are served by maintaining the confidentiality of internal investigations is undercut by the fact that the information in question was divulged by the state itself when the FDLE sent Cooper a courtesy copy of the letter it sent to Dillon. If maintaining the secrecy of the information was crucial to the investigative process, the FDLE would not have released it in the first place. See Landmark Communications, Inc., 435 U.S. at 845,

16

98 S. Ct. at 1545 (noting that the harms associated with dissemination of sensitive information "can be eliminated through careful internal procedures"); Cox Broad. Corp., 420 U.S. at 496, 95 S. Ct. at 1047 (stating that the onus is on the state to keep matters confidential if they do not want them to be disseminated). Accordingly, the proposed interest in safeguarding the integrity of the investigative process does not constitute a sufficiently compelling state interest to justify the proscriptions in FLA. STAT. ch. 112.533(4).

Second, the interest in protecting wrongfully accused officers from defamation is insufficient to sustain the statute. As the Supreme Court noted in Landmark, "[o]ur prior cases have firmly established . . . that injury to official reputation is an insufficient reason for repressing speech that would otherwise be free." Landmark Communications, Inc., 435 U.S. at 841-42, 98 S. Ct. at 1543 (internal citations omitted); see also Butterworth, 494 U.S. at 634, 104 S. Ct. at 1382 (noting that "reputational interests alone cannot justify the proscription of truthful speech"). The proper remedy for wrongfully accused officers is found in Florida's libel laws, see FLA. STAT. ch. 112.532(3) & 770.01 et seq., rather than a restriction which operates to suppress members of the press from reporting information of public concern. Cf. Sullivan, 376 U.S. at 279-80, 84 S. Ct. at 726 (detailing the standard for a libel action that should be used for redress of injury to

official reputation).  Moreover, the argument that FLA. STAT. ch. 112.533(4) can protect the reputations of law enforcement officials is illusory:  Cooper could have connected Christensen's name with calumny without violating the statute by simply publishing the reasons for which he filed a complaint against Christensen. Thus, by imposing a restriction on speech after Cooper could have already impugned Christensen's conduct, the statute only serves to "engender resentment, suspicion, and contempt" about investigative processes rather than protecting official reputations.  Bridges v. California, 314 U.S. 252, 271, 62 S. Ct. 190, 197 (1941).  In a free society, the public's trust in an official's reputation is won by greater transparency, not the silencing of criticism.  Thus, the interest of safeguarding the reputations of accused officers purportedly served by FLA. STAT. ch. 112.533(4) is not sufficiently compelling to justify the statute's restrictions.

Third, Dillon cites safeguarding the privacy interests of targets, witnesses, and complainants in the investigation as a compelling state interest.  Supreme Court precedent has confirmed that interests in privacy are insufficient to support criminal sanctions for the publication of lawfully obtained information.  See Florida Star v. B.J.F., 491 U.S. 524, 537, 109 S. Ct. 2603, 2611 (1989); Smith, 443 U.S. at 104, 99 S. Ct. at 2671.  "If there are privacy interests to be protected in [the context of FDLE investigations], the State[] must respond by means which avoid

18

public documentation or other exposure of private information." Cox Broad. Corp., 420 U.S. at 496, 95 S. Ct. at 1047. Accordingly, the privacy interests of targets, witnesses, and complainants are not sufficiently compelling to uphold the restrictions in FLA. STAT. ch. 112.533(4).

Because the curtailment of First Amendment freedoms by FLA. STAT. ch. 112.533(4) is not supported by a compelling state interest, the statute fails to satisfy strict scrutiny and unconstitutionally abridges the rights to speak, publish, and petition government. This result is dictated not only by Supreme Court precedent, which has specifically rejected the state interests proposed by Dillon, but also by the constitutional tenets recognized in the Court's jurisprudence. In Mills v. Alabama, the Supreme Court noted that:

> the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve. Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free.

384 U.S. 214, 219, 86 S. Ct. 1434, 1437 (1966). By criminalizing the disclosures made in Cooper's articles, FLA. STAT. ch. 112.533(4) succeeded in penalizing the very kind of expression which the Mills Court declared was constitutionally

19

essential. As we discussed, our system of representative democracy depends upon an informed citizenry which can hold government officials accountable and can seek redress for grievances. This is especially important where, as in this case, a citizen alleges a local official acted inappropriately. See Wood, 370 U.S. at 390, 82 S. Ct. at 1374 ("Particularly in matters of local political corruption and investigations is it important that freedom of communication be kept open . . . ."). If government has the power to indict and incarcerate reporters for publishing truthful information lawfully obtained about government officials, "timidity and self-censorship" among members of the press are more likely, Cox Broad. Corp., 420 U.S. at 496, 95 S. Ct. 1046, which may have the effect that "some continuing public grievances could never be discussed at all," Wood, 370 U.S. at 392, 82 S. Ct. at 1374. We do not lightly invalidate an act of a state legislature. See Georgia Cemetery Ass'n v. Cox, 353 F.3d 1319, 1321 (11th Cir. 2003) (per curiam). But, by proscribing speech critical of government officials, FLA. STAT. ch. 112.533(4) purports to regulate speech which "lies near the core of the First Amendment" without a compelling justification for doing so. Landmark Communications, Inc., 435 U.S. at 838, 98 S. Ct. at 1541. As such, we find FLA. STAT. ch. 112.533(4) to be an unconstitutional abridgment of core First Amendment rights.

20

B.  Cooper's § 1983 Claims

Now that we have determined that FLA. STAT. ch. 112.533(4) is unconstitutional, we turn to Cooper's claims that Dillon's enforcement of the statute subjected him to liability under § 1983[6] in his individual and official capacities.  The district court granted Dillon's motions for summary judgment in both capacities after finding that the statute was not unconstitutional.  On appeal, Dillon argues that he is entitled to qualified immunity in his individual capacity and that there can be no liability in his official capacity.  "We review de novo a district court's disposition of a summary judgment motion[,] . . . applying the same legal standards as the district court."  Storck v. City of Coral Springs, 354 F.3d 1307, 1309 (11th Cir. 2003).

1.  Claims Against Dillon in His Individual Capacity

"Qualified immunity insulates government officials from personal liability [under § 1983] for actions taken pursuant to their discretionary authority."  See Waldrop v. Evans, 871 F.2d 1030, 1032 (11th Cir. 1989).  Provided the

_____

[6] Section 1983 provides that:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .
42 U.S.C. § 1983.

21

government official proves that he was acting within the scope of his discretionary authority, the plaintiff has the burden to show that: (1) the officer's conduct violated a constitutional right and (2) the right was clearly established. See Storck, 354 F.3d at 1314 (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)). A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is "apparent." See Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987); see also Storck, 354 F.3d at 1314 ("If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity."). This standard does not require that the specific conduct in question was previously found to be unlawful; the state of the law need only give an officer "fair warning" that his conduct is unlawful. Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002). In this way, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier, 533 U.S. at 206, 121 S. Ct. at 2158.

Based on the foregoing, Dillon was eligible for qualified immunity because he was acting under his discretionary authority in enforcing FLA. STAT. ch. 112.533(4) and its unlawfulness was not clearly established. At the time of Cooper's arrest, the statute had not been declared unconstitutional, and therefore it

22

could not have been apparent to Dillon that he was violating Cooper's constitutional rights. See Michigan v. DeFillippo, 443 U.S. 31, 38, 99 S. Ct. 2627, 2632 (1979) ("Police are charged to enforce laws until and unless they are declared unconstitutional."). While Cooper argues that the unconstitutionality of the pre-1990 version of the statute and Supreme Court precedent gave Dillon "fair warning" that the new version would also be constitutionally deficient, such an argument is not persuasive. The legislative history reveals that the current version of the statute was designed to correct the constitutional problems within the pre-1990 statute, see FLA. S. STAFF ANALYSIS & IMPACT STATEMENT CS/SB 1290 at 2 (Apr. 18, 1990), and Dillon was entitled to assume that the current version was free of constitutional flaws. See DeFillippo, 443 U.S. at 38, 99 S. Ct. at 2632; see also Grossman v. City of Portland, 33 F.3d 1200, 1209 (9th Cir. 1994) (noting that "police officers on the street are ordinarily entitled to rely on the assumption that [legislators] have considered the views of legal counsel and concluded that the ordinance is a valid and constitutional exercise of authority"). We also reject Cooper's argument that the statute was "so grossly and flagrantly unconstitutional," DeFillippo, 443 U.S. at 38, 99 S. Ct. at 2632, that Dillon should have known it was unconstitutional: clearly, in light of the district court's disposition of Cooper's constitutional challenge to the statute, reasonable public

23

officials could have differed as to the constitutionality of the statute prior to this case. Moreover, Cooper's alternative argument—that Dillon actually meant to charge him with a violation of the pre-1990 statute after it had been declared unconstitutional—similarly fails because the district court found, and we agree, that the reference to § 112.533(3) in Dillon's affidavit was a "scrivener's error" and therefore not a reference to the pre-1990 statute.[7] Accordingly, Dillon is entitled to qualified immunity in his individual capacity as to Cooper's § 1983 claims.

2. Claims Against Dillon in His Official Capacity

When suing local officials in their official capacities[8] under § 1983, the plaintiff has the burden to show that a deprivation of constitutional rights occurred

---

[7] As Cooper notes on appeal, the district court held a hearing to resolve a factual dispute on this issue. Because the pre-1990 version of the statute was numbered at § 112.533(3) and outlawed similar conduct as the current § 112.533(4), the district court found that Dillon inadvertently entered the wrong statute number on his affidavit. The State Attorney, however, was apparently under the impression that Dillon meant to charge Cooper with a violation of the pre-1990 version of § 112.533(3) because he declined to prosecute on the grounds that the statute was deemed unconstitutional in Hickox. In addition, Cooper presented evidence that Dillon used language in his deposition which tracked the language of the pre-1990 statute. Despite this evidence, however, a district court's findings of fact in the context of a qualified immunity claim are reversed only if they are "clearly erroneous," Zeigler v. Jackson, 716 F.2d 847, 850 (11th Cir. 1983) (per curiam), a standard not met on the evidence cited by Cooper here.

[8] We note that a suit against Dillon "in his official capacity" is the same as a suit against the municipality of the City of Key West. See McMillian v. Monroe County, 520 U.S. 781, 785 n.2, 117 S. Ct. 1734, 1737 n.2 (1997). As a municipality, pursuant to Florida law, Key West is not insulated from suit in this case by sovereign immunity under the Eleventh Amendment. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70, 109 S. Ct. 2304, 2312 (1989) ("States are protected by the Eleventh Amendment while municipalities are not . . . .") (citing Monell, 436 U.S. 658, 690 n.54, 98 S. Ct. at 2035 n.54 (1978)).

24

as a result of an official government policy or custom. See Little v. City of North Miami, 805 F.2d 962, 965 (11th Cir. 1986) (per curiam) (quoting Monell v. Dep't of Social Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 2035-36 (1978)). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality . . . . A custom is a practice that is so settled and permanent that it takes on the force of law." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). "Only those officials who have final policymaking authority may render the municipality liable under § 1983." Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S. Ct. 1292, 1299 (1986) (plurality opinion)). "[S]tate and local positive law" determine whether a particular official has final policymaker authority for § 1983 purposes. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct. 2702, 2724 (1989). "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Pembaur, 475 U.S. at 480, 106 S. Ct. at 1298.

Based on the foregoing, we must determine whether Dillon had final policymaking authority for the City of Key West in law enforcement matters and whether his decision to enforce FLA. STAT. ch. 112.533(4) against Cooper was an

25

adoption of "policy" sufficient to trigger § 1983 liability. While Dillon does not address the issue of his policymaking authority under Florida law, he argues that his enforcement of a state law could not subject the municipality to liability. We disagree.

First, state law demonstrates that Dillon was the ultimate policymaker for police procedure in the City of Key West. The Florida Constitution provides that "[m]unicipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government," FLA. CONST. art. VIII, § 2(b), and the Florida Constitution was amended to confer such municipal powers on the City of Key West, see id. at art. VIII, § 6(e). Based on this grant of power, the City of Key West adopted a Code of Ordinances which established that the police chief has final policymaking authority for police procedure in the City of Key West. See KEY WEST, FLA., CODE OF ORDINANCES § 4.05 (establishing position of police chief as the "head" of the police department and giving him "exclusive control of the stationing and transfer" of police officers).[9] Aside from the powers given to the police chief by Key West ordinance pursuant to the delegation of municipal power in the Florida Constitution, there are other indicia in state law that police chiefs in

_____

[9] Dillon confirmed this interpretation of his role as police chief by admitting in the record that he had the ultimate authority to decide whether he wanted to arrest an individual for a violation of the law.

26

Florida have final policymaking authority in their respective municipalities for law enforcement matters. See FLA. STAT. ch. 166.049 (declaring that the police chief is to determine police procedure for coordinating communication between law enforcement officers); FLA. STAT. ch. 870.042(2) (stating that the police chief can declare a state of emergency in the municipality and assume emergency powers). State and local law thus confirms that Dillon had final policymaking authority for the City of Key West in matters of police procedure and law enforcement and thus his actions could subject the city to § 1983 liability.

Second, based on this authority, we find that Dillon's decision to enforce FLA. STAT. ch. 112.533(4) constituted a deprivation of constitutional rights sufficient for § 1983 liability. See Board of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 405, 117 S. Ct. 1382, 1389 (1997) ("[P]roof that a municipality's . . . authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably."). Although the facts before us demonstrate that Dillon enforced the statute only once against Cooper, "evidence of a single violation of federal rights . . . c[an] trigger municipal liability." See Brown, 520 U.S. at 409, 117 S. Ct. at 1391; accord Martinez v. City of Opa-Locka, 971 F.2d 708, 713 (11th Cir. 1992) (per curiam). Accordingly, we reject Dillon's argument that the single enforcement of

the statute against Cooper could not constitute a "policy" for § 1983 purposes. See

Martinez, 971 F.2d at 715 (finding monetary damages award against municipality

was appropriate where the City Manager, who had final policymaking authority

with respect to personnel decisions, terminated a city employee for exercising her

First Amendment rights to criticize the City Manager).  Similarly, we reject

Dillon's argument that, based on the reasoning in Surplus Store & Exchange, Inc.

v. City of Delphi, 928 F.2d 788, 791 (7th Cir. 1991), Key West cannot be liable for

enforcing an unconstitutional *state* statute which the municipality did not

promulgate or adopt.  First, § 1983 liability is appropriate because Key West did

adopt the unconstitutional proscriptions in FLA. STAT. ch. 112.533(4) as its own.

See KEY WEST, FLA., CODE OF ORDINANCES § 42-1 ("It shall be unlawful for any

person to commit, within the city limits, any act which is or shall be recognized by

the laws of the state as an offense.").  Second, Surplus Store is inapposite because

it involved the enforcement of a state statute by a municipal police officer who was

not in a policymaking position.  See 928 F.2d at 788.  In this case, by contrast,

Dillon was clothed with final policymaking authority for law enforcement matters

in Key West and in this capacity he chose to enforce the statute against Cooper.

While the unconstitutional statute authorized Dillon to act, it was his deliberate

decision to enforce the statute that ultimately deprived Cooper of constitutional

28

rights and therefore triggered municipal liability. See McKusick v. City of Melbourne, 96 F.3d 478, 484 (11th Cir. 1996) (finding § 1983 liability could exist where the decision of how and when to enforce an injunction resulted in deprivation of constitutional rights). Thus, Dillon's decision to enforce an unconstitutional statute against Cooper constituted a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy." Pembaur, 475 U.S. at 483, 106 S. Ct. at 1300; see McKusick, 96 F.3d at 484 (noting that "the City could elect not to arrest anyone at all"). Accordingly, we find that the City of Key West, through the actions of Dillon, adopted a policy that caused the deprivation of Cooper's constitutional rights which rendered the municipality liable under § 1983.

### III. CONCLUSION

In this appeal, Cooper argued that the district court erred in finding that FLA. STAT. ch. 112.533(4) was a permissible time, place, and manner regulation of the freedoms of speech and of the press and the right to petition government. As we have explained, however, FLA. STAT. ch. 112.533(4) is a content-based restriction that chills the exercise of fundamental First Amendment rights without a compelling justification for doing so and accordingly is unconstitutional. Because the statute's unconstitutionality was not clearly established prior to its

29

enforcement, Dillon is entitled to qualified immunity and therefore is shielded from liability under § 1983 in his individual capacity. However, as a municipal official with final policymaking authority as to law enforcement matters, Dillon did expose the City of Key West to § 1983 liability by choosing to enforce the statute against Cooper. Accordingly, we **REVERSE** the district court's grant of summary judgment in favor of Dillon and **REMAND** for further proceedings consistent with this opinion.