Florence VERNA, Plaintiff,

v.

The **PUBLIC HEALTH TRUST OF MIAMI–DADE COUNTY** d/b/a Jackson Memorial Hospital, Defendant.

No. 07–20332–CIV.

United States District Court,
S.D. Florida.

Feb. 26, 2008.

G. Ware Cornell, Jr., Cornell & Associates, P.A., Weston, FL, for plaintiff.

R.A. Cuevas, Jr., County Atty., Scott B. Mario, Asst. County Atty., Miami, FL, for defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT: CLOSING CASE

ALAN S. GOLD, District Judge.

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment [DE 22] as to all counts of Plaintiff's Second Amended Complaint: (1) Race and National Origin Discrimination under the Florida Civil Rights Act ("FCRA"); (2) Retaliation under the FCRA; (3) Disability Discrimination under the FCRA; (4) Disability Discrimination and Perceived Disability Discrimination in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and, (5) Violation of Constitutional Rights under 42 U.S.C. § 1983. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 over the federal claims (Counts IV and V), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims (Counts I–III). The parties have filed a response and reply, as well as statements of undisputed and disputed facts. In addition, I held oral argument on the Motion on February 22, 2008. Having reviewed the parties' pleadings, the record evidence and relevant case law, and having considered the parties' arguments, I conclude that summary judgment should be entered for Defendant as to all counts of Plaintiff's Second Amended Complaint.

### I. Factual Background

Defendant filed a Statement of Material Facts [DE 24], and several depositions and exhibits in support of its motion for summary judgment. In turn, Plaintiff filed a Statement of Disputed and Additional Facts,[1] as well as a public records request letter sent to Jackson Memorial Hospital's Risk Management Department, and the response to her request. [DE 30 at Ex. A]. Upon a careful review of the record, I find the following relevant facts to be undisputed and supported by evidence.

### A. The Parties

Plaintiff Florence Verna ("Plaintiff" or "Verna") is a black female of Haitian national origin. (Statement of Material Facts, ¶ 1). Verna was employed by Defendant The Public Health Trust of Miami–Dade County ("Defendant" or "Trust") from 2001 until 2004, when she was laid off during a large scale reduction in force.[2] (*Id.*). The Trust is a public institution

---

1. Plaintiff's Statement of Disputed and Additional Facts is incorporated into its Opposition to Defendant's Motion for Summary Judgment [DE 30]. I will treat Plaintiff's incorporated statement as her attempt to comply with S.D. Fla. L.R. 7.5.

2. Plaintiff does not dispute that the Trust underwent a reduction in force. Rather, she alleges that her inclusion into the lay off was a set up, and that she was incorporated into the lay off falsely. (Statement of Additional Facts, DE 30 ¶ 1). Verna further states that "it is suspect that a statutorily mandated position that Verna held would be slated for elimination." (*Id.* at ¶ 2). I will address these arguments in Section III of this Order.

which operates Jackson Memorial Hospital in Miami–Dade County, Florida. (*Id.* at ¶ 2). I take judicial notice of the fact that the Trust is formed under Chapter 25A of the Miami–Dade County Code. Fed. R.Evid. 201.

### B. Verna's Employment with the Trust

Verna began working for the Trust as a Risk Management Coordinator in 2001. (*Id.* at ¶ 3). In 2002, her position was reclassified to Facility Risk Manager. (*Id.*). In 2003, she received a promotion to Associate Administrator in the Risk Management Department. (*Id.*). Her job duties included maintaining an incident reporting system; handling claims and litigation activities; and making recommendations for corrective action. (*Id*). Verna's immediate supervisor was Juan Reyes ("Reyes"), Director of the Risk Management Department. (*Id*). Reyes reported to Abbe Bendell, Vice President for Care Management. (Statement of Additional Facts, DE 30 ¶ 1).

Besides holding the position of Associate Administrator in the Risk Management Department, Verna also served as the hospital's designated Patient Safety Officer. (Statement of Material Facts, DE 24, ¶ 4). Florida Statute § 395.1012(2) requires healthcare facilities to appoint a Patient Safety Officer "for the purpose of promoting the health and safety of patients, reviewing and evaluating the quality of patient safety measures used by the facility, and assisting in the implementation of the facility patient safety plan." Fla. Stat. § 395.1012(2).

Verna received an "exceeds standards" on her August 2004 evaluation, and Reyes testified that "Florence is a very hard worker. She used to come in early, leave late. Was really a great asset to the de-

partment." (Statement of Additional Facts, DE 30, ¶ 6).

### C. Confrontations with Co–Workers

Verna's job duties often brought her into contact with Leah Jaffe ("Jaffe"), the Quality Management Coordinator for the Division of Nursing. (Statement of Material Facts, DE 24, ¶ 5). Verna believes that Jaffe is responsible for her termination from the Public Health Trust. (*Id.*). According to Verna, Jaffe "was the mastermind of my wrongful termination." (*Id.*)

Both Verna and Jaffe were involved in conducting "root cause analysis," a method of investigating incidents aimed at determining the root cause of a problem and developing strategies to prevent the problem from recurring. (*Id.* at ¶ 6). Jaffe felt that Verna could be argumentative with people and abrasive to the point that it negatively impacted the process of root cause analysis. (*Id.*). According to Verna, Jaffe once told her that she needed "to learn the culture of this hospital." (*Id.*). Verna took this comment to be a reference to her race or national origin. (*Id.*). Jaffe also made references about Verna's accent and her ability to speak English, such as "I don't understand what you're trying to say. What is this? What language?." (Verna Depo., 96:14–18). Verna further alleges that Jaffe made comments about Verna not knowing what she was doing, and that she told people that Verna was not going to make it as a patient safety officer. (*Id.* at 101:18–21).

Verna believes that Jaffe "poisoned her name" so that the first time Verna met Bendell, she told Verna "I hear that you're a very difficult person to work with." (*Id.* at 94:2–7; 103: 8–9; 105: 8–15). Jaffe alleges that other people complained to her about Verna's abrasive behavior.[3] (State-

---

**3.** Verna objects to this testimony as hearsay. Hearsay statements, even if stated in a deposition, cannot be considered on a motion for

summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999) ("The

ment of Material Facts, DE 24 ¶ 7). Jaffe brought these concerns to the attention of Verna's supervisor, Reyes, and to Dr. Gerard Kaiser, Executive Vice President. (*Id.*). Reyes testified that he had heard "anecdotal stories" that Verna sometimes "rubbed people the wrong way." (*Id.*). However, no one ever demanded that Reyes discipline Verna or terminate her employment. (*Id.*).

Jaffe was never Verna's supervisor. (*Id.* at ¶ 8). Jaffe never recommended to anyone that Verna be laid off, nor did she have the authority to make decisions concerning Verna's employment with the Trust.[4] (*Id.*)

Verna's job duties also brought her into contact with Jane Mass ("Mass"), the Chief Nursing Officer. (*Id.* at ¶ 9). As the Patient Safety Officer, Verna participated in weekly patient safety rounds led by Mass, and attended the weekly meeting of the Clinical Nurse Practice Group, which Mass chaired. (*Id.*). Despite their frequent interaction, Verna and Mass worked in different departments. (*Id.*). Mass was never Verna's supervisor. (*Id.*).

Verna and Mass "locked horns" on one occasion. (*Id.* at ¶ 10). According to Mass, Verna had developed a procedure for auditing patient records which Mass regarded as too complicated. (*Id.*). Mass told Verna that the procedure was too cumbersome and would not be used. (*Id.*). According to Mass, Verna insisted on distributing copies of the procedure during the February 26, 2004 meeting of the Clinical Nurse Practice Group. (*Id.*). In response, Mass admonished Verna that she had already been told not to do that. (*Id.*). As Mass recalls, Verna became furious.[5] (*Id.*).

According to Verna, she was told to bring tools to measure the patient safety goals to the meeting. At the meeting, Jaffe verbally attacked her and wrongfully accused her of disclosing the tools prior to the meeting. (Statement of Additional Facts, DE 30, ¶ 9). According to Verna, Jaffe told her: "everything you do is a mistake." (Verna Depo., 93:3–12).

## D. Verna's Complaints

On February 29, 2004, Verna wrote a letter to Ardy Dargahi ("Dargahi"), Compliance Officer in the Risk Management Department, accusing Mass of yelling at her and ridiculing her during the February

general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment."). However, Verna does not dispute that Reyes heard anecdotal stories about Verna; and Verna further argues that Jaffe "poisoned her name." Therefore, I will consider Jaffe's statement for the limited purpose that Jaffe told others at the Trust that people complained about Verna, but I will not consider it for the truth of the matter asserted. *See Brown v. Metro. Atlanta RTA,* Case No. 06–16434, 2008 WL 60279, 2008 U.S.App. LEXIS 351 (11th Cir. Jan. 7, 2008) (recognizing that a statement is not hearsay when it is not offered for the truth of the matter asserted) (citing Fed.R.Evid. 801(c)).

**4.** Plaintiff argues that although Jaffe did not have the authority to make decisions, it is not known how much weight the decision-makers over Verna's employment gave to Jaffe's com-

ments about Verna. Plaintiff's speculation as to the weight these unidentified decision-makers gave to the alleged comments is not supported by record evidence and has no probative value. *See Thomas v. Nicholson,* Case No. 07–13527, 2008 WL 205060, *2, 2008 U.S.App. LEXIS 1772, **6–7 (11th Cir. Jan. 25, 2008) ("Unsubstantiated assertions alone are not enough to withstand a motion for summary judgment. Similarly, speculation does not create a genuine issue of fact.") (quoting *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987); and *Cordoba v. Dillard's Inc.,* 419 F.3d 1169, 1181 (11th Cir. 2005) (quotations and citations omitted)).

**5.** Verna adds that although Mass criticized Verna's tools as too complicated, three months later those tools were implemented. (Statement of Additional Facts, DE 30, ¶ 9).

26, 2004 meeting, (the "Feb. 29 Letter"). (Statement of Material Facts, DE 24, ¶ 11). Verna also asserted that she had been treated unfairly since receiving her promotion to Associate Administrator. (*Id.*). In the letter, Verna requested "an investigation to find the real cause for such violation behaviors in this workplace." (*Id.* at Ex. 9). The letter further states that the implementation of the National Patient Safety Goals had been the most difficult task she had ever had to implement "not because of the amount of work, not the complexity of the project, [but] because of the resistance to change by key administrators who do not want to make it easy for me to achieve." (*Id*). She also indicated that she was the third Patient Safety Officer to try to implement these goals within a two-year period, and that "the task was not easy for them either." (*Id.*). Verna further alleged that Mass and Jaffe, as wail as others present at the February 26 meeting, made very hostile remarks and ridiculed her work product. (*Id.*). Verna commented that "[b]eing a risk manager is not easy, you are never liked because you need to make the difficult decisions and give accurate information all the time. I cannot please everyone . . ." (*Id*).

Twice in the three-page letter Verna rhetorically asked: "Is it my color?." (*Id.* at Ex. 9). The first instance was after she indicated that following the February 26 meeting incident she received calls from other employees who felt bad for her and tried to giver her words of encouragement. She then wrote: "No matter what I try, good or bad it does not matter—I am still no good, [sic] Is it my color? Is it my attitude toward hard work? Is it the hospital culture, [sic]." In the next paragraph, she wrote: "Everything I do is wrong in [Jaffe's] eyes, is it my color?" (*Id.*). She concluded the letter by writing:

> I would like to know exactly why I am being persecuted. Why I was mistreat-

ed by Jane Mass? Why is Jane Mass telling my boss that I will not succeed as a Patient Safety Officer? Why does Leah Jaffe continue to make defamatory statements about my character? She keeps telling everyone that I am too aggressive and not a nice person? I would like to know why she is allowed to persecute employees?

(*Id.*). There is no evidence in the record of Dargahi's response, if any.

On October 27, 2004, Verna wrote a letter to Marvin O'Quinn, President and Chief Executive Officer of the Jackson Health System. (*Id.* at ¶ 12). Verna's letter stated that she "would like to discuss . . . and make [him] aware of critical issues that could negatively affect the institution's accreditation status in the upcoming JCAHO [Joint Commission on Accreditation of Healthcare Organizations] survey." (*Id.*). According to the letter, Verna had presented the National Safety Goals to the Executive Committee a year earlier and had advised Mr. O'Quinn that they were approximately 70% in compliance with the National Patient Safety Goals. (*Id.* at Ex. 12). In the letter, Verna expressed concerns that "little had been resolved" since that time. *Id.* Verna's letter did not make any reference to discrimination or hostility in the workplace. There is no evidence in the record of a response.

## E. Verna's Medical Condition

Verna suffers from Type I (insulin-dependent) diabetes. (Statement of Material Facts, DE 24, ¶ 13). As a result, she has developed diabetic neuropathy, a condition which affects the blood vessels serving the nerves that go to the feet. (*Id.*). Common symptoms of diabetic neuropathy include numbness and tingling of the lower extremities. (*Id.*). According to Verna,

she also experiences cramping in her toes and pain when she walks too much. (*Id.*).

From April 2002 through April 2005, Verna's treating physician was Jorge Diego, M.D. (*Id.* at ¶ 14). Dr. Diego treated Verna to "manage complications of advancing kidney disease or progressive diabetic kidney disease," a common complication of diabetes. (Diego Depo., 4:19–25). Dr. Diego described Verna as outwardly appearing very well, of always giving "an outward appearance of being control, being strong, things are managed ... a lady who had a lot of energy ...," but internally she was "a house riddled with termites." (Diego Depo., 17:9–19). He also testified that Verna complained to him of increased tiredness and fatigue. (*Id.* at 31:1–2). Nonetheless, according to Dr. Diego, Verna's medical condition did not prevent her from maintaining an active lifestyle and did not substantially interfere with her ability to walk or work. (Statement of Material Facts, DE 24, ¶ 14; Diego Depo., 28–31). For example, in a progress note dated April 28, 2005, Dr. Diego commented that "[Verna] continues to be very active, and it would be difficult to say that she had any illness just by looking at her." (Statement of Material Facts, DE 24, ¶ 14.). Concerning Verna's functional limitations, Dr. Diego testified that while under his care, Verna was able to care for herself in terms of getting dressed and feeding herself. (*Id.*). She was also able to perform manual tasks, such as cooking, cleaning, and writing. (*Id.*). Verna was able to see, hear, breathe normally, and to speak and communicate. (*Id.*). He also testified that Verna was able to sit for periods of time, stand for short periods of time, that nothing in his records indicated

she was not able to climb stairs, and that he believed she was able to drive and was in fact driving to her appointments. (*Id.*).

As to Verna's ability to walk, Dr. Diego testified that he never observed Verna using any devices such as a crane, a crutch or a brace. (*Id.* at ¶ 15). When asked if Verna was able to walk short distances, he responded that "she seemed to have a lot of vitality. She didn't drag herself around, she walked in. She externally appeared normal." (*Id.*). He added, however, that he only observed her walk from the front door to the chair. (Diego Depo., 30:19–25). He could not recall whether he ever observe her walk with a limp, and opined that she would be able to walk a tenth of a mile. (*Id.*).

Dr. Diego testified that he never recommended that Verna use a motorized scooter or golf cart. (*Id.* at ¶ 19). As Dr. Diego explained, "it would have been strange for me to have recommended that" given his impression that Verna was a physically active individual who managed to lead a normal life in spite of her illness. (*Id.*). Dr. Diego's records do not reflect that he ever placed Verna on any medical restrictions at work. (*Id.* at ¶ 20). Similarly, Dr. Diego's records contain no indication that Verna ever requested that he provide medical documentation to her employer in support of a request for accommodation. (*Id.*)

According to Verna, beginning in June 2003, she orally requested a golf cart for transportation to meetings at the main hospital. (*Id.* at ¶ 16). Verna claims that she initially made this request to her supervisor, Reyes, who referred her to Dargahi.[6] (*Id.*). Reyes admits that he was

---

6. Verna also claims that she made several verbal requests to Dargahi, but never received a golf cart. (*Id.*). However, other than her conclusory statement, there is no record evidence of her alleged requests to Dargahi. *See*

*Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217(11th Cir.2000) ("Conclusory allegations without specific supporting facts have no probative value.").

aware of Verna's medical condition, and that at some point she requested a golf cart or scooter because of difficulties in walking related to her overall medical condition. (Reyes Depo., 6:23–25; 7:1–9). According to Reyes, he was not able to obtain a golf cart for Verna because of budgetary constraints. (*Id.* at 7:12–20). Reyes testified that there was, however, a vehicle assigned to his department which was available for Verna's use if she needed to carry items from one building to another. (*Id.* at 7:21–25; 8:1–6). According to Reyes, Verna did not request any other accommodations. (*Id.* at 8:4–6). Verna never submitted any written request for accommodation to the Trust; nor did she ever contact the Trust's ADA Coordinator.

Verna claims that she was unable to attend some meetings because it was too painful for her to walk. (Statement of Material Facts, DE 24, ¶ 18). On those occasions, Verna would send another employee to the meetings in her place. (*Id.*). On days when Verna had more than one meeting at the same location, she would remain at that location rather than returning to her office between meetings. (*Id.*). According to Verna, she took these steps to help herself; sometimes she would

have to wait for two or three hours between meetings because it was painful to walk. (Verna Depo., pp. 118–119). Verna "didn't want people to feel that 'Oh, my God, she won't be able to do her job, and she needs a cart". (Verna Depo., 118:2–5.).

## F. Restructure, Reduction in Workforce and Verna's Termination from the Trust

During 2003 and 2004, the Trust was under pressure to drastically cut costs or face losses exceeding $200 million. (Statement of Material Facts, DE 24, ¶ 21). Deloitte and Touche ("Deloitte"), a consulting firm, was hired to advise the Trust on how to reduce costs and achieve financial stability. (*Id.*; Ex. 10, April 2004 Letter from O'Quinn regarding Deloitte Consulting's Project "ReCreate Jackson"). According to Vice President Bendell, the decision to eliminate positions was based strictly on Deloitte's advice. (*Id.* at ¶ 23). Mass stated that Deloitte "didn't look at who was in [the positions to be eliminated], but rather the positions per se."[7] (*Id.*).

Within the Risk Management Department, Bendell was the individual who decided which positions would be eliminated.[8]

---

7. In her Statement of Additional Facts, Verna misconstrues Defendant's statements to allege that Deloitte specifically identified Verna's position for elimination. (Statement of Additional Facts, DE 30 at ¶ 1). Verna also points out that in response to a public records request of "all documents prepared by Deloitte & Touche regarding reductions in the Risk Management Department" she was told that no such documents existed. (Plaintiff's Opposition to Summary Judgment, DE 30 at Ex. A). In actuality, however, both Plaintiff and Defendant agree that while Deloitte recommended that a number of management positions be eliminated, Deloitte did not recommend any specific position or employee to be included in the reduction in force initiative. Defendant concedes that there is no written report specific to the Risk Management Department.

8. In her pleadings, Verna states that she disputes this fact; however, she has cited to no record evidence showing a dispute. Instead, she points to arguments regarding the fact that Deloitte did not specifically recommend that Verna's position be eliminated, and to arguments related to Daugherty's lack of medical background. In addition, she states: "At her termination meeting, Verna told Abbe Bendell that Bendell had just eliminated a position that was mandated by law." (Statement Additional Facts, DE 30, ¶ 8). Verna's statement, therefore, is an admission that Bendell was the person who eliminated her position. Additionally, Defendant has submitted the deposition of Bendell in which she testifies that she was the decision-maker. Finally, during the February 22 Hearing, plaintiffs counsel conceded that Bendell was the decision maker.

(*Id.* at ¶ 24). At that time, there were three manager positions in the Risk Management Department. (*Id.*). Bendell was required to eliminate two of the three positions. (*Id.*) Verna's position was one of those selected for elimination. (*Id.*). Accordingly, on November 1, 2004, Bendell presented Verna with a letter informing her that her position as an Associate Administrator was being eliminated effective November 1, 2004.[9] (*Id.* at ¶ 25; Ex. 13, Nov. 1, 2004 Termination Letter from Bendell). Upon Verna's termination, Verna's duties as the Patient Safety Officer were reassigned to Dr. James Multach, a physician who was already on staff as the Associate Chief Medical Officer.[10] (*Id.* at ¶ 26).

On November 1, 2004, Reyes resigned.[11] (*Id.* at ¶ 27). At the time of his resignation, there were three employees who reported directly to Reyes: (1) Verna; (2) Renee Daugherty ("Daugherty"); and, (3) Jose Nunez. (Reyes Depo., 5:2–23). Reyes was asked who he would leave in his place as the Acting Administrator. (Statement of Material Facts, DE 24 ¶ 27). He recommended Daugherty, a Senior Claims Adjuster. (*Id*). Daugherty, a white female, was named the Acting Administrator effective November 27, 2004. (*Id.*).[12] Ac-

9. During oral argument, Plaintiff argued that Verna's position was eliminated on November 3rd or 4th, 2004. However, the termination letter, a copy of which has been submitted into the record, is dated November 1, 2004, and states that Verna's termination was effective November 1, 2004. (Termination Letter, DE 24 at Ex. 12).

10. Verna questions the objectivity of a doctor performing the role of a Patient Safety Officer and the wisdom of such a selection. These arguments do not preclude the entry of summary judgment. *See Thomas*, 2008 WL 205060, *2, 2008 U.S.App. LEXIS 1772 at **6–7 (holding that unsubstantiated assertions and speculation do not defeat a motion for summary judgment).

11. Verna argues that Reyes resigned prior to her termination, and that she should have been promoted to his position rather than being laid-off. However, the record evidence shows that Verna's position was eliminated effective November 1, 2004, (Termination Letter, DE 24, Ex. 12), and that Reyes' resignation was effective November 27, 2004. (Reyes Depo., 12:18–25, 13:1–2).

12. Verna relies on deposition testimony of Desiree Samuel to support her allegation that she should have been promoted to Reyes position. However, the quotes relied on by Verna need to be considered in the context of the entire deposition. For example, Verna claims that she was "second in command" and a "direct report" of Juan Reyes. (Statement of Additional Facts, DE 30, ¶ 4). Defendant does not dispute that Verna was a direct report; however, so was Daugherty. As to

being second in command, Samuel testified that "[Verna] was basically second in command of [Reyes]. I know she was an administrator, but I don't know at what level." (Samuel Depo., 5:3–8). Having admitted that she has no personal knowledge as to Verna's level in the hierarchy, Samuel's opinion that Verna was "basically second in command" has no probative value. *See, e.g., Reis v. Universal City Dev. Ptnrs, Ltd.*, 442 F.Supp.2d 1238, 1252 (M.D.Fla.2006) ("This statement, however, lacks probative value because it is a conclusory allegation, lacking specific supporting facts, of a matter outside Plaintiffs personal knowledge."). Moreover, Reyes has testified that he recommended Daugherty as his successor because "really the only person that I thought would be able to maintain the department integrally, and how I had developed it, and envisioned it over those six and a half years that I had developed the program was Renee [Daugherty]." (Reyes Depo., 12:18–25). Verna also relies on Samuel's deposition for the proposition that Daugherty was "at a level inferior to Verna." Such was not Samuel's testimony. Samuel testified that Daugherty and Verna were not on the same level because "as far as I know, *I think* [Daugherty] reported to Jose [Nunez]." (Samuel Depo., 7:10–19) (emphasis added). The undisputed record evidence, however, shows that Daugherty, like Verna, reported directly to Reyes. Moreover, Samuel had previously stated that she did not know what the level of Verna's position. More importantly, whether Verna was at a higher level than Daugherty, and whether Reyes' decision to recommend Daugherty for the promotion was not a sound business decision, are not

cording to Verna, Daugherty was not the right choice for the promotion because she did not have a medical background. (Statement of Additional Facts, DE 30, ¶ 5). In fact, Daugherty had previously asked Verna to train her on how to do a root cause analysis—something her new position required her to handle. (*Id.*). During oral argument, Plaintiff conceded that Reyes' recommendation of Daugherty was not motivated by discriminatory intent.

At the time of her termination, Verna had seven employees under her supervision—six nurses and one secretary. (*Id.*). According to Verna, there was a click among the white female employees at the hospital—the "white girls clan"—and Daugherty was "buddy buddy" with Jaffe and Bendell. (*Id.*).

### G. Partially Disputed Facts

■ According to Defendant, Deloitte determined that the Trust had too many management-level positions, and recommended that a number of positions be eliminated in order to achieve a ratio of managers to non-managerial employees that was greater than 1:15. (Statement of Material Facts, DE 24, ¶ 22). Plaintiff disputes the role of Deloitte in the restructuring of the Risk Management Department. In response to a public records request of "all documents prepared by Deloitte & Touche regarding reductions in the Risk Management Department" she was told that no such documents existed. (Plaintiff's Opposition to Summary Judgment, DE 30 at Ex. A). In its Reply, Defendant explains that it has never asserted that Deloitte prepared a report recommending that specific employees be laid off. Bended, Reyes, and Mass have testified Deloitte recommended

that the number of management-level positions be reduced in order to achieve a ratio of no more than 1:15. During oral argument, Plaintiff objected to this testimony as hearsay because there is no evidence in the record to substantiate these statements which, according to Plaintiff, are being offered for the truth of the matter asserted. Hearsay statements, even if stated in a deposition, cannot be considered on a motion for summary judgment. *See Macuba,* 193 F.3d at 1322 ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment"). However, if the statements are not being offered for the truth of the matter asserted, then the statements are not hearsay. *See Brown,* 2008 WL 60279, *5, n. 9, 2008 U.S.App. LEXIS 351, at *15, n. 9 (recognizing that a statement is not hearsay when it is not offered for the truth of the matter asserted) (citing Fed.R.Evid. 801(c)).

For purposes of this Motion, whether these statements are "true"—that is, whether the Trust needed to achieve a managerial ratio of no more than 1:15 in order to be financially stable—is immaterial. Instead, these statements are offered as Defendant's belief that lay offs were necessary. Since this evidence is not being offered for the truth of matter asserted, it is not hearsay. *Brown v. Metro. Atlanta RTA,* Case No. 06–16434, 2008 WL 60279, 2008 U.S.App. LEXIS 351 (11th Cir. Jan. 7, 2008) (recognizing that a statement is not hearsay when it is not offered for the truth of the matter asserted) (citing Fed.R.Evid. 801(c)). Even if Plaintiff was correct that Deloitte's recommendations were hearsay, additional and undisputed record evidence in this case establishes that: (1) Deloitte was hired to

material issues in this case. The real issue is whether Verna was included in the lay offs instead of being offered the promotion be-

cause of her race, national origin, medical condition, or as retaliation for the Feb. 29 Letter.

advise the Trust on how to reduce costs and achieve financial stability, (Statement of Material Facts, DE 24 at Ex. 10, April 2004 Letter from O'Quinn regarding Deloitte Consulting's Project "ReCreate Jackson"); and, (2) as a result of Deloitte's consulting work, approximately 5% of employees were impacted in the form of reassignments, restructuring and layoffs, (id. at Ex. 11, Sept. 2004 Bulleting from O'Quinn Regarding Reduction in Force). Moreover, at oral argument, the parties agreed that two of the three managerial-level employees within Verna's department were laid-off, and that Bendell was the individual who decided to terminate these two positions. Verna's termination was effective November 1, 2004. (See Termination Letter, DE 24 at Ex. 12). The parties also agreed that the third risk management manager, Reyes, tended his resignation on November 1, 2004, to be effective on November 27, 2004; and that Daugherty, a white female, was promoted to Reyes' position.

## H. Procedural History and Conditions Precedent

On November 21, 2004, Verna filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR"). (Statement of Material Facts, DE 24 at ¶ 28). On March 31, 2005, the EEOC issued its dismissal and notice of right to sue. (Id. at ¶ 29). The FCHR failed to issue a "reasonable cause" determination or a "no cause" determination within 180 days of the date Verna filed her charge of discrimination. (Id. at ¶ 30). On August 4, 2005, Verna filed suit in the Circuit Court of the Eleventh Judicial Circuit in Miami–Dade County, Florida. Florence Verna v. Public Health Trust of Miami–Dade County d/b/a Jackson Memorial Hospital, case no. 05–15887–CA–08. (Id. at ¶ 31). Verna's complaint asserted claims based on the

Florida Civil Rights Act, Fla. Stat § 760.01 et seq. (Id.). On January 16, 2007, Verna filed a motion seeking leave to amend her complaint in order to plead claims under 29 U.S.C. § 794 (the "Rehabilitation Act") and 42 U.S.C. § 1983. (Id. at ¶ 32). On February 12, 2007, the Trust filed a Notice of Removal and removed the case to this Court pursuant to 28 U.S.C. §§ 1441 and 1446 [DE 1]. On March 20, 2007, Verna filed her Second Amended Complaint [DE 11]. The Trust filed its Answer on April 9, 2007. (DE 12). Subsequently, on October 29, 2007, the Trust filed the instant Motion for Summary Judgement [DE 22].

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512; Bishop v. Birmingham Police Dep't, 361 F.3d 607, 609 (11th Cir.2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Celotex v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for

the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir.2001).

In assessing whether the movant has met her burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party. *Denney,* 247 F.3d at 1181. In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### III. Analysis

### A. Race and National Origin Discrimination under the Florida Civil Rights Act

The FCRA makes it unlawful for an employer to "discharge ... any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status." Fla. Stat. § 760.10(1)(a). A claim of discrimination under the FCRA[13] may be proved through either direct evidence, circumstantial evidence, or statistical proof. *Tippie v. Spacelabs Med., Inc.,* 180 Fed.Appx. 51, 53 (11th Cir.2006) (citing *Earley v. Cham-*

*pion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990)). Direct evidence is evidence which, if believed, proves the existence of a fact in issue without inference or presumption. *Id.* at 54. "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic] constitute direct evidence of discrimination." *Id.* (citing *Bass v. Bd. of County Comm'rs, Orange County, Florida,* 256 F.3d 1095, 1105 (11th Cir.2001)). Since Verna has not offered any direct evidence of discrimination or statistical proof, I construe Count I as one needing to be proved through circumstantial evidence.

Establishing a *prima facie* case of race or national origin discrimination by circumstantial evidence in the context of reduction in force ("RIF") cases requires the plaintiff to prove that: (1) she is a member of a protected class; (2) at the time of her discharge she was qualified to assume another position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class, or was treated less favorably than a similarly situated person outside the protected class. *Rowell v. BellSouth Corp.,* 433 F.3d 794, 798 (11th Cir.2005); *see also Jeronimus v. Polk County Opportunity Council,* 145 Fed.Appx. 319, 324 (11th Cir.2005) (citing *Maynard v. Bd. of Regents of the Univs. of Fla. Dep't of Educ.,* 342 F.3d 1281, 1289 (11th Cir. 2003)).[14] A crucial component in deciding

---

13. In analyzing a discrimination claim under the FCRA, courts use the same framework as claims brought under Title VII. *See, e.g., Hampton v. City of S. Miami,* 186 Fed.Appx. 967, 970 n. 1 (11th Cir.2006) ("Federal case law interpreting Title VII is applicable to cases arising under the FCRA."); *Wilbur v. Corr. Servs. Corp.,* 393 F.3d 1192,1195 n. 1 (11th Cir.2004) (noting in a retaliation case that the FCRA is patterned after Title VII and no independent analysis of the claim under the FCRA is necessary); *Florida State Univ. v.*

*Sondel,* 685 So.2d 923, 925 n. 1 (Fla. 1st DCA 1996) ("Federal case law interpreting Title VII and the ADEA is applicable to cases arising under the Florida Act").

14. Plaintiff relies on *Jameson v. Arrow Co.,* 75 F.3d 1528, 1532 (11th Cir.1996) to argue that because Verna was qualified for the promotion at the time of her discharge, there is sufficient evidence for a fact-finder to reasonably conclude that Defendant intended to dis-

if discrimination can be inferred is whether employees outside of plaintiff's protected class were treated more favorably than the terminated employee. *Quick v. Tripp, Scott, Conklin & Smith, P.A.*, 43 F.Supp.2d 1357, 1371 (S.D.Fla.1999). To prove discriminatory intent, the plaintiff must produce enough evidence to "lead the factfinder reasonably to conclude either that the defendant consciously refused to consider retaining or relocating a plaintiff because of her [race], or (2) regarded [race] as a negative factor in such consideration." *Id.*

■ Showing that plaintiff's duties were distributed to current employees fails to establish that the defendant sought to replace her. *See Moore v. Alabama State Univ.*, 864 F.2d 103, 105 (11th Cir.1989) (stating that since plaintiff "was not replaced by anyone," there was "nothing to show that defendants acted in any way because of plaintiff's sex."); *Lieberman v. Miami–Dade County*, Case No. 99–1714, 2000 WL 1717649, *6 (S.D.Fla. Aug.16, 2000) ("The fact that her duties were redistributed among other current employees demonstrates that the County was not seeking to replace her.").

■ In cases involving the denial of a promotion, "a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the person who received the position he coveted." *Springer v. Convergys Customer Mgmt. Group*, 509 F.3d 1344, 1349(11th

Cir.2007)(quoting *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir.2006)). Under the law of this Circuit, a plaintiff must also show that: (1) she applied for and was qualified for the position for which the employer was seeking applicants, (2) that she was denied the promotion, and (3) that another equally or less qualified individual outside the protected class received the promotion. *See, e.g., Batey v. Stone*, 24 F.3d 1330, 1334 n. 11 (11th Cir.1994) (citing *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988)); *see also Hellums v. Webster Indus.*, 97 F.Supp.2d 1287, 1295 (M.D.Ala. 2000). Besides showing that the defendant's employment decision was mistaken, the plaintiff must show that is was in fact motivated by race. *Springer*, 509 F.3d at 1349 (citing *Brooks*, 446 F.3d at 1163). Therefore, a plaintiff has the burden of showing that disparities between the person who received the position and her own qualifications are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (quoting *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir.2004)).

Once the plaintiff establishes a *prima facie* case of employment discrimination, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged employment decision. *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir.2001);

criminate. However, in Jameson, the Court stated:

> Although from the evidence in the record thus far, a trier of fact could infer that there was no intent to discriminate against [plaintiff], it could infer instead that [defedant] deliberately refused to transfer or to rehire [plaintiff] for jobs for which she was qualified at the time of her discharge because of her age and race.

Jameson does not apply because the undisputed evidence in the record is that Verna's

termination was effective on Nov. 1, 2004, but the position of Acting Risk Manager was not available until November 27, 2004. Moreover, while Defendant has not disputed that Plaintiff was qualified for the position from which she was terminated, there is no record evidence that establishes that Verna was qualified for the promotion. The only evidence of record is that Reyes recommended Daugherty.

*Mont–Ros v. City of W. Miami,* 111 F.Supp.2d 1338, 1348, 1349 (S.D.Fla.2000) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). This burden of rebuttal "is merely one of production, not persuasion, and is exceedingly light." *Mont–Ros,* 111 F.Supp.2d at 1349–1350 (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); and *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982)). If the defendant meets this burden, plaintiff must prove that the advanced reason was a pretext; in other words, "plaintiff must establish both that the proffered reason for the employment decision was false and that the real reason for the action was discrimination." *Springer,* 509 F.3d at 1349. To avoid summary judgment, the "plaintiff must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Thomas v. Nicholson,* Case No. 07–13527, 2008 WL 205060, \*\*2–3, 2008 U.S.App. LEXIS 1772, \*\*6–7 (11th Cir. Jan. 25, 2008) (quoting *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1228 (11th Cir.1993)) (internal quotations omitted). "[U]nsub-

stantiated assertions alone are not enough to withstand a motion for summary judgment." *Id.* (quoting *Rollins,* 833 F.2d at 1529). Similarly, "[s]peculation does not create a genuine issue of fact[.]" *Id.* (quoting *Cordoba,* 419 F.3d at 1181).

 Here, it is undisputed that Verna is a member of a protected class (Black), and that she suffered an adverse employment action (termination). While there is no question that Verna was qualified for the position she was terminated from, in RIF cases, the real issue is whether at the time of her discharge she was qualified to assume another position. *See Rowell,* 433 F.3d at 798.[15] The question thus turns as to whether Verna was either replaced by a person outside the protected class, or was treated less favorably than a similarly situated person outside the protected class.

 The undisputed record evidence shows that Verna's position as Associate Administrator was eliminated. Therefore, no one was hired to replace her. Similarly, her duties as the Patient Safety Officer were re-distributed to a physician who was already on staff. While Verna conclusory alleges that white employees were treated

---

**15.** Verna urges this court to interpret her request for a golf cart as a request for a reasonable accommodation under the ADA. Whether an employer provided an individual a reasonable accommodation is considered in the context of whether the plaintiff is a qualified individual under the statute. Specifically, to prove that she is a qualified individual, a plaintiff must establish that she can perform the essential functions of the position with or without reasonable accommodations. *Carlson,* 2007 WL 1632267 at \*2 (quoting 29 C.F.R. § 1630.2(m)). Courts must give consideration to an employer's judgment and the employer's written description for that job as to what functions are essential. *See* 42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description .... this description shall be considered evidence of the

essential functions of the job."). An employer may be liable for failing to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. *See* 42 U.S.C. § 12112(b)(5)(A); *see also Schwertfager,* 42 F.Supp.2d at 1364 (citing *Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996)). As to her positions as Associate Administrator or Patient Safety Officers, there is no allegation or record evidence that Verna was terminated because she was unqualified. As to the promotion, there is no allegation or record evidence that the position required an amount of walking that Verna was not qualified to do without a golf cart. More important, there is no allegation or record evidence that the reason she was not given the promotion was because of her alleged difficulty in walking. For these reasons, I need not consider the issue of reasonable accommodations.

more favorably, there is absolutely no evidence in the record to support her claim. The record evidence is that there were three managers in risk management, and that Bendell believed she needed to terminate two of those positions to achieve her restructuring goals. (Bendell Depo., 8:1 – 25). The three managerial employees were Reyes, Verna and [first name unknown] Farook. Bendell decided to terminate Verna and Farook. Reyes resigned soon after. Therefore, there is no record evidence from which to infer that Verna was treated less favorably than others similarly situated.

Verna's argument is that discrimination can be inferred from the fact that she was laid-off rather than being promoted to Reyes' position. According to Verna, either because of her race, national origin, or medical condition, the position was given to Daugherty, a white individual who was less qualified. Verna's argument fails because, even assuming that defendant's employment decision was mistaken, she has failed to produce any evidence that the mistaken decision was motivated by race. The undisputed evidence is that Daugherty and Verna reported directly to Reyes, and that when asked to recommend his replacement, Reyes recommended Daugherty. Although Verna argues that Daugherty did not have a medical background, and that she once asked Verna to train her in root cause analysis, Verna has not established that the disparities between Daugherty and her own qualifications are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Springer*, 509 F.3d at 1349 (quoting *Cooper*, 390 F.3d at 725). More importantly, Verna does not even allege that Reyes' decision to recommend Daugherty over Verna was motivated by discriminatory intent. *Id.* (holding that besides showing that the defendant's employment decision was mistaken, the

plaintiff must show that is was in fact motivated by race). During oral argument, Plaintiff conceded that Reyes did not have discriminatory intent. In addition, the undisputed record evidence is that Verna's termination was effective November 1, 2004, but Reyes' position was not available until November 27, 2004. Therefore, Verna cannot prove that "at the time her discharge she was qualified to assume another position." *Rowell*, 433 F.3d at 798 (emphasis added). Finally, Verna has neither alleged nor produced any evidence showing that she applied for the promotion and was denied. In conclusion, under the undisputed record evidence, and taking all inferences in favor of Plaintiff, I conclude that Verna has failed to establish a prima facie case of race or national origin discrimination in the context of Defendant's large scale reduction in force.

 Even if Verna could establish a prima facie case, Defendant has articulated a legitimate non-discriminatory reason for Plaintiff's termination. First, the record evidence is that Verna's position was eliminated as part of a large scale reduction in force. (See Statement of Material Facts, DE 24 at Ex. 10 (Letter from O'Quinn regarding Deloitte Consulting's "Project ReCreate Jackson"), and Ex. 11 (Bulleting from O'Quinn regarding reduction in force)). Defendant has established that it's decision to eliminate Verna's position was based on the fact that a large scale reduction in force was necessary for the Trust to achieve financial stability. It is undisputed that dozens of management-level positions were terminated along with Verna's, including one other manager in Verna's department. Plaintiff has not shown that this non-discriminatory, legitimate business reason is a pretext. For example, there is no statistical data that a large percentage of the terminated em-

ployees were either disabled or black from which to infer discriminatory intent. Nor is there any evidence that risk management managers outside of Verna's protected class were treated more favorably. The fact that Verna believes she was better qualified for the promotion than Daugherty is not sufficient, as a matter of law, to show that the non-discriminatory reason is pretextual. *Cf. Minhngoc P. Tran v. Boeing Co.*, 190 Fed.Appx. 929, 933–934 (11th Cir.2006) ("The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons."). There is absolutely no record evidence that Verna's race played any role in Bendell's decision to eliminate her position. For these reasons, Defendant is entitled to summary judgement as to Count I of the Second Amended Complaint.

**B. Retaliation under the Florida Civil Rights Act**

In Count II of the Second Amended Complaint, Plaintiff alleges that Defendant violated the FCRA when it terminated her employment in retaliation for Plaintiff's February 29, 2004 letter to the Compliance Officer complaining about the treatment received at the February 26, 2004 meeting (the "Feb. 29 Letter"). Defendant does not dispute that termination of employment is not an adverse employment action. *See Dar Dar v. Associated Outdoor Club, Inc.*, 201 Fed.Appx. 718, 723 n. 3 (11th Cir.2006) (upholding district court's finding that employee's termination was an adverse action under the FCRA).[16] Rather, Defendant argues that summary judgment is appropriate because: (1) as a matter of law the Feb. 29 Letter does not constitute

a protected activity under the FCRA; (2) the undisputed facts do not establish a causal connection between the alleged statutory protected activity and the adverse employment action; and, (3) because Verna has not shown that the elimination of her position pursuant to a large-scale reduction in force was a pretext for discrimination. I agree.

 The FCRA makes it an "unlawful employment practice for an employer … to discriminate against any person … because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section." Fla. Stat. § 760.10(7). A *prima facie* case of retaliation requires that the plaintiff prove, by a preponderance of the evidence: (1) that she engaged in a statutorily protected activity; (2) that an adverse employment action occurred; and, (3) that the adverse action was related to the protected activities. *Dar Dar*, 201 Fed.Appx. at 721.

 To establish that one has engaged in statutorily protected activity, the plaintiff must show that she "opposed conduct by the employer based upon an objectively reasonable belief that the employer was engaged in unlawful employment practices." *Marcelin v. Eckerd Corp. of Fla.*, Case No. 04–CV–491–T–17, 2006 WL 923745, *8 (M.D.Fla. April 10, 2006) (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385 (11th Cir.1998)). In addition, plaintiff must show that the decision-maker responsible for the adverse employment action was actually aware of the protected activity at the time he took the adverse action. *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir.2000). To constitute protected activity, "a plaintiff

---

**16.** Since Florida has modeled the FCRA after Title VII, Florida courts apply Title VII case law to claims of unlawful retaliation brought

under the FCRA. *Dar Dar*, 201 Fed.Appx. at 721 (applying Title VII case law to analyze a FCRA retaliation claim).

must, at the very least, communicate her belief that illegal discrimination is occurring." *Marcelin,* 2006 WL 923745 at * 8 (citing *Webb v. R & B Holding Co.,* 992 F.Supp. 1382, 1389 (S.D.Fla.1998)) ("It is not enough for the employee merely to complain about a certain policy or certain behavior ... and rely on the employer to infer that discrimination has occurred."). An employee's complaint "must clearly put an employer on notice of a violation of the law." *Id.*[17]

■ The causal connection required between the protected activity and the adverse action is construed broadly. *Higdon v. Jackson,* 393 F.3d 1211, 1221 (11th Cir. 2004). Thus, "a plaintiff merely has to prove that the protected activity and the ... [adverse] action are not completely unrelated." *Id.* (quoting *Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998)); *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1277–78 (11th Cir.2008). As a preliminary matter, to show a causal connection, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Goldsmith,* 513 F.3d at 1278 (citing *Brungart,* 231 F.3d at 799). This element can be satisfied by providing sufficient evidence of knowledge of the protected activity and a close temporal proximity between this awareness and the adverse action. *Id.* In

*Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), the Supreme Court cited with approval decisions in which a three to four months period between the activity and the adverse action did not show a causal connection. *Higdon,* 393 F.3d at 1221. "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Id.*

■ As previously stated, there is no dispute in this case that the termination of Verna's employment constituted an adverse employment action. In order to avoid summary judgment, therefore, Plaintiff must also show that she engaged in statutorily protected activity, and that there was a causal connection between her termination and the protected activity. Plaintiff has shown neither. The alleged protected activity was the Feb. 29 Letter[18] prompted by the incident during the Feb. 26, 2004 meeting of the Clinical Practice Group, when Verna attempted to distribute copies of a document and Mass and Jaffa "verbally attacked" her. In the letter, Verna complained that Mass had yelled at her and ridiculed her work and that she had been subject to unfair treatment since her promotion. The letter also stated that the two individuals who had

17. In *Marcelin,* the court noted that other circuits that have analyzed the issue have consistently held that whether an employee's complaints amount to protected activity depends on whether the complaints clearly put an employer on notice of a violation of the law. *See Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 262 (1st Cir.1999) (no protected activity where plaintiff complained of supervisor's treatment but never stated a belief that it violated Title VII or any other law); *Gleason v. Mesirow Fin.,* 118 F.3d 1134 (7th Cir.1997) (granting summary judgment and finding that general complaints absent specific allegations of sexual harassment

do not constitute protected activity); *Barber v. CSX Distrib. Servs.,* 68 F.3d 694 (3d Cir.1995) (letter to HR complaining about unfair treatment but not specifically complaining about discrimination is not protected activity).

18. In her Opposition to Defendant's Motion, Plaintiff does not allege that the October 27, 2004 letter to O'Quinn, President and Chief Executive Officer of the Jackson Health System, was protected activity. The letter discussed the Joint Commission on Accreditation of Healthcare Organizations' upcoming survey.

previously held her position also had a hard time implementing the goals, and that the difficulties of her job arose out of "resistance to change by key administrators." Moreover, the letter indicated that "[b]eing a risk manager is not easy, you are never liked because you need to make the difficult decisions and give accurate information all the time." None of these allegations are related to Plaintiffs race, national origin or disability. While the letter requested "an investigation to find the real cause for such violation behaviors in this workplace," the letter does not reference any law or policy that the complained of behavior was violating. Finally, although the letter includes the question "is it my color?" in two different paragraphs, read as a whole, the letter is not sufficient, as matter of law, to "clearly put an employer on notice of a violation of the law." *Marcelin*, 2006 WL 923745 at * 8; *cf. Higgins*, 194 F.3d at 262 (no protected activity where plaintiff complained of supervisor's treatment but never stated a belief that it violated Title VII or any other law); *Gleason, v. Mesirow Fin.*, 118 F.3d 1134 (7th Cir.1997) (granting summary judgment and finding that general complaints absent specific allegations of sexual harassment do not constitute protected activity); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694 (3d Cir.1995) (letter to HR complaining about unfair treatment but not specifically complaining about discrimination is not protected activity).

Even if the Feb. 29 Letter could amount to protected activity, summary judgment must be entered because Plaintiff has not presented any record evidence, not even an allegation, that Bendell was aware of the Feb. 29 Letter when she decided to eliminate Verna's position. Bendell could not have been motivated to retaliate by a letter she was not aware of. *Cf. Brungart*, 231 F.3d at 799 ("A decision maker cannot have been motivated to retaliate by something unknown to him").

Finally, the nine months temporal proximity between the letter and her termination, in the absence of any other evidence tending to show causation, fails to establish a *prima facie* case for retaliation under the FCRA. *Cf. Higdon*, 393 F.3d at 1221 ("By itself, the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action.").

The claim also fails because, as already discussed, Defendant has established a non-discriminatory, legitimate business reason for removing Plaintiff from the position—the reduction in force recommended by Deloitte—and Plaintiff has failed to demonstrate that this non-discriminatory, legitimate business reason is a pretext. Both because Plaintiff has failed to establish a *prima facie* case of retaliation under the FCRA, and because she has failed to show pretext, summary judgment as to Count II of the Second Amended Complaint is hereby entered in favor of Defendant.

## C. Disability Discrimination under the Florida Civil Rights Act

Plaintiff alleges that Defendant violated the FCRA through the discriminatory termination of her employment because of her medical condition, diabetic neuropathy. Defendant responds that Plaintiff has failed to make a *prima facie* case under the act because she has not shown that she is disabled. Specifically, Defendant argues that Plaintiff has not shown that she suffers from a mental impairment that substantially limits one or more of his major life activities. Furthermore, even assuming that Plaintiff has made a prima facie case, summary judgement is appropriate because Defendant has shown a legitimate and justifiable non-discriminatory business

reasons for terminating Plaintiff and Plaintiff has failed to show pretext. As discussed more fully below, I agree with the Defendant that Plaintiff has failed to establish a *prima facie* case for discrimination disability under the FCRA, and I have already concluded that Plaintiff has failed to demonstrate that Defendant's non-discriminatory reason is pretextual.

The FCRA provides, in relevant parts, that:

It is an unlawful employment practice for an employer:

(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.

(b) To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.

Fla. Stat. § 760.10(1)(a)-(b). The FCRA does not define the term handicap. Instead, in analyzing a disability discrimination claim under the FCRA, courts use the same framework as disability claims brought under the ADA. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir.2007) ("[D]isability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims."); *Byrd v. BT Foods, Inc.*, 948 So.2d 921 (Fla. 4th DCA 2007) ("As applied to discrimination based on a handicap, the FCRA is construed in conformity with the federal Americans with Disabilities Act."); *Carlson v. Liberty Mut. Ins.*, No. 06–15417, 2007 WL 1632267, *1 (11th Cir.

June 7, 2007) ("A disability discrimination claim brought under the FCRA is analyzed under the same framework as ADA claims.") (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n. 2 (11th Cir.2005)).

To establish a *prima facie* claim of disability discrimination under the ADA, and consequently under the FCRA, a plaintiff must show that: (1) she has a disability; (2) she is a qualified individual; and, (3) the employer unlawfully discriminated against her because of her disability. *Carlson*, 2007 WL 1632267 at *1; *Holly*, 492 F.3d at 1255–1256. Defendant does not argue that Plaintiff was not qualified to do her job. Rather, Defendant contests that Plaintiff was disabled and that it discriminated against her because of her medical condition. I will address each of the contested elements in turn.

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Id.* (quoting 42 U.S.C. § 12102(2)); *Wimberly v. Sec. Tech. Group, Inc.*, 866 So.2d 146, 147 (Fla. 4th DCA 2004) (same). To qualify as a disabled person, a person must either be completely unable to perform the activity, or significantly restricted as compared to an average person. *Wimberly*, 866 So.2d at 147. Factors considered to determine if a person is substantially limited include: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and, (3) the permanent or long term impact of or resulting from the impairment. *Id.* (citing 29 C.F.R. § 1630.2(j)(2)).

Major life activities ("MLAs") "are functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and work-

ing." *Carlson,* 2007 WL 1632267 at *1 (quoting 29 C.F.R. § 1630.2(i)). With respect to working, "substantially limits" requires that an individual's ability to perform either a class of jobs or a broad range of jobs in various classes is significantly restricted as compared to the average person having comparable training, skills, and abilities. *id.* (citing 29 C.F.R. § 1630.2(j)(3)(*l* )). Thus, an individual's inability "to perform a single, particular job, does not constitute a substantial limitation in the major life activity of working." *Id.* "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *see also Wimberly,* 866 So.2d at 147 ("An impairment's minor interference in major life activities does not qualify as a disability.").

 Here, Defendant is entitled to summary judgment as to Count III of the Second Amended Complaint because Plaintiff has failed to demonstrate that she is a disabled person under the FCRA. It is undisputed that Plaintiff suffers from diabetic neuropathy, and that from April 2002 through April 2005 she was under the car of Dr. Diego in order to "complications of advancing kidney disease or progressive diabetic kidney disease." (Diego Depo., 4:19–25). However, having an impairment does not translate to being disabled under the ADA.

Dr. Diego has testified that outwardly Verna always appeared well—that "it would be difficult to say that she had any illness just by looking at her." (Diego Depo., 33–34). He further testified that despite her medical condition, Verna maintained an active lifestyle. (*Id.* at 28–32). While under his care, Verna was able to take care for herself: she could get dress, feed herself, perform manual tasks such as cooking and cleaning; she could also write, drive, was able to see, hear, speak and

communicate. (*Id.*) According to her doctor, Verna was able to sit for periods of time, and stand for short periods of time. (*Id.*). Further, Dr. Diego testified that he never observed Verna using any devices such as a crane, a crutch or a brace, in order to walk, and he does not recall ever observing Verna walking with a limp. (*Id.*). During his deposition, he opined that Verna could walk a tenth of a mile. (*Id.*). On the other hand, Dr. Diego testified that Verna complained to him of increased tiredness and fatigue, and that internally she was like "a house riddled with termites." (Diego Depo., 17:9–19). He also stated that "[t]he majority of individuals with her type of kidney disease, unless they succumb to heart attack or stroke, will eventually end up on dialysis or need a transplant." (Diego Depo., 8:21–24).

Verna alleges that her medical condition "caused frequent, painful cramping to her legs and prevented her from walking long distances." (Second Am. Compl., ¶ 19). During her deposition, Plaintiff testified that sometimes she would have to wait two or three hours between meetings because it was painful to walk, and that she did this because she did not want people to say "Oh, my God, she won't be able to do her job, and she needs a cart". (Verna Depo., 118:2–5.). Taking Plaintiff at her word, she has failed to show that her medical condition substantially impacted a major life activity; these minor interferences in the major life activity of walking and/or working do not qualify as a disability. *Cf. Wimberly,* 866 So.2d at 147 ("An impairment's minor interference in major life activities does not qualify as a disability."). Plaintiff has not alleged that she was not able to work, perform manual tasks, drive, hear, see, or speak. At best, Plaintiff argues that her ability to walk was impacted by the pain. However, she was able to walk, and her doctor never recommended

that she acquire a motorized wheelchair or other walking aide. In addition, she has testified that when the pain was very high, she would send one a member of her staff to the meetings. As a matter of law, this minor interference with her ability to attend all meetings, specially since she had staff members that could attend on her behalf, does not rise to the level of a disability under the ADA.

Plaintiff has also failed to show that the employer unlawfully discriminated against her because of her disability. To begin with, Verna has produced no record evidence showing the Bendell was aware of Verna's medical conditions. Similarly, Verna has not submitted any evidence, direct or circumstantial, of discriminatory intent. All Plaintiff has demonstrated is that she was terminated from a position in a large-scale reduction in force initiative.

Having concluded that, as a matter of law, Plaintiff is not a disabled person under the ADA, and that Plaintiff has failed to submit even a shred of evidence of discriminatory event, summary judgement in favor of Defendant is entered as to Count III of the Second Amended Complaint. Even if Plaintiff had established that she was disabled, and had shown discriminatory intent, summary judgment would be appropriate because, as discussed above, Plaintiff has failed to show that Defendant's non-discriminatory and legitimate business reason for Plaintiff's termination is pretextual.

### D. Disability Discrimination in Violation of the Rehabilitation Act

Section 504 of the Rehabilitation Act prohibits discrimination against an otherwise qualified disabled person under any program or activity receiving federal financial assistance. 29 U.S.C. § 794. The standard for determining liability under the Rehabilitation Act is the same as that under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"); thus, "cases involving the ADA are precedent for those involving the Rehabilitation Act." *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir.2005) (citing *Cash v. Smith,* 231 F.3d 1301, 1305 (11th Cir.2000) and 29 U.S.C. § 794(d)).

In order to establish a *prima facie* case of discrimination under the Rehabilitation Act, the plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified for the position; and, (3) she was subjected to unlawful discrimination as the result of her disability. *Ellis,* 432 F.3d at 1326 (citing *Sutton v. Lader,* 185 F.3d 1203, 1207–08 (11th Cir.1999)). In this case, it is undisputed that Plaintiff was qualified for the positions she held at the Trust.

An individual with a disability is defined as a person who "(i) has a physical or mental impairment which substantially limits one or more major life activities; (ii) has a record of such impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). Under the Rehabilitation Act, it is not enough that a plaintiff demonstrate that an adverse employment action was based partly on his disability. *Ellis,* 432 F.3d at 1326. "Rather ... a plaintiff must prove that he suffered an adverse employment action 'solely by reason of' her handicap". *Id.* (citing 29 U.S.C. § 794(a)).

Plaintiff's claim under the Rehabilitation Act fails for the same reason that her claim of disability discrimination failed under the FCRA. First, Plaintiff has failed to show that her medical condition substantially limits one or more major life activities. Second, Plaintiff has not established that the reason her position was eliminated was based on her medical condition. Under the Rehabilitation Act, Plaintiff must prove that the *sole* reason she was terminated was her handicap. *See* 29 U.S.C.

§ 794(a). Here, Defendant has shown that her position was eliminated as part of a large scale reduction in force initiative. Moreover, Plaintiff's own allegations that she was terminated because of her race and national origin contradict the argument that her medical condition was the sole reason for her termination.

Verna has also failed to establish that she was regarded as being disabled. Dr. Diego has testified that Verna's outward appearance was normal, and it would be difficult to say that she had any illness just by looking at her. Verna has testified that the reason she would rest for two or three hours following a meeting was to avoid others thinking that she was disabled. More importantly, there is not a shred of evidence in the record that any one of Verna's co-workers, including the final decision makers, regarded Verna as disabled because of her diabetes. The undisputed facts establish that, as a matter of law, Verna was not disabled, was not regarded as being disabled, and was not terminated solely because of her medical conditions. Therefore, summary judgment in favor of Defendant is appropriate.

### E. Violation of Constitutional Rights Pursuant to 42 U.S.C. § 1983

Plaintiff alleges that she was denied equal protection of the laws when Defendant colluded to terminate and replace her with a white individual with less qualifications. According to Plaintiff, Defendant knew that because of Reyes' impending resignation, Verna would be named Acting Risk Manager and be in line for promotion to Director of Risk Management.

 To establish municipality liability under § 1983, a plaintiff must show a deprivation of constitutional rights occurred as a result of an official government policy or custom. *Ludaway v. City of Jacksonville*, 245 Fed.Appx. 949, 951 (11th

Cir.2007). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. A custom is a practice that is so settled and permanent that it takes on the force of law." *Id.* (quoting *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir.2005)). Only officials with final policymaking authority may render a municipality liable. *Cooper*, 403 F.3d at 1221. Whether an official has final policy making authority is determined by state and local law. *Id.* It has long been established by this Court that "[t]he final policy making authority for Miami–Dade County rests solely with the Board of County Commissioners or the County Manager." *Wilson v. Miami–Dade*, No. 04–23250, 2005 U.S. Dist. LEXIS 45544, 2005 WL 3597737, at **8–10 (S.D.Fal. Oct. 11, 2005) (Moore, J.) (granting motion to dismiss based on failure to plead that the Board or Manager were responsible for the alleged violations and holding that only the Board or Manager could be final policy maker for the County); *Buzzi v. Gomez*, 62 F.Supp.2d 1344, 1359–1360 (S.D.Fla.1999) (finding that the Director of the Miami–Dade Police Department was not the final policy maker for the County); *Lawrence v. Metro Dade County*, 872 F.Supp. 957, 965 (S.D.Fla.1994) (same). Under appropriate circumstances, a single act by a final policy-maker with policymaking authority may give rise to municipal liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452(1986).

Verna has not alleged, much less proved, the existence of an official custom or policy that lead to the alleged deprivation of her constitutional rights. There is also no record evidence that the decision to terminate her position was made by an individual with final policy making authority. It is undisputed that Bendell was the individual who decided to terminate Verna's position.

Verna seems to argue that since Bendell had the authority to terminate her position, she had final policymaking authority for purposes of § 1983. However, there is no evidence in the record demonstrating that Bendell has final policymaking authority, and "this Court has repeatedly held that the County's various department heads and other administrators ... do not have final policymaking authority over the County's various employment matters." *Cf. Moore v. Miami–Dade County*, Case No. 02–33421, 2005 WL 3273722, * 9 (S.D.Fla. Sep.30, 2005).

 In addition, Verna claims that Jaffe, the Quality Management Coordinator for the Division of Nursing, is responsible for her termination from the Trust. Even taking Plaintiff at her word, her § 1983 claim fails because there is no evidence of record that Jaffe was an official with final policymaking authority, in fact, Plaintiff does not dispute that Jaffe did not have the authority to make decisions concerning Verna's employment with the Trust. Instead, she argues that Jaffe's comments influenced the decision makers. Under the law of this Circuit, that is not sufficient to impose liability on a municipality. *See, Cooper*, 403 F.3d at 1221 ("Only officials with final policymaking authority may render a municipality liable."). For these reasons, Defendant is entitled to summary judgment on Count V of the Second Amended Complaint.

## IV. Conclusion

Being fully advised and having considered the pertinent portions of the record and applicable law, it is hereby

**ORDERED and ADJUDGED:**

1. Defendant's Motion for Summary Judgment as to all counts of the Second Amended Complaint [DE 22] is **GRANTED.**

2. All other pending motions are **DENIED AS MOOT.**

3. All hearing dates are **CANCELLED.**

4. This case is **CLOSED.**

**DONE AND ORDERED.**